**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ROBERT ALPERT, *et al.* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-3774 |
| | § | |
| MARK R. RILEY, *et al.* | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

This memorandum and opinion addresses the following motions filed by Mark Riley and

Dixie Meynier:

1.  The motion for partial summary judgment that limitations bars the plaintiffs' causes of action relating to Robert Alpert's finances and businesses other than the Roman Alpert Trust (RAT), Daniel Alpert Trust (DAT), and the Children's Trust. (Docket Entries No. 361, 362). The plaintiffs responded, (Docket Entry No. 415), and the defendants replied, (Docket Entry No. 433).

2.  The motion for partial summary judgment that the plaintiffs' cannot show the elements necessary for their claims under RICO, 18 U.S.C. § 1861, *et seq.* (Docket Entry No. 363). The plaintiffs responded, (Docket Entry No. 416), and the defendants replied, (Docket Entry No. 432).[1]

The defendants' motion for summary judgment on limitations, (Docket Entries No. 361,

362), is granted in part and denied in part. The motion is granted as to the plaintiffs' claims for

conversion, negligence, gross negligence, and negligent misrepresentation based on the pre-

September 2002 transactions relating to the CRUT, and denied as to the plaintiffs' claims for fraud,

breach of fiduciary duties, aiding and abetting a breach of fiduciary duties, and the plaintiffs' request

---

[1]   The plaintiffs have also moved for partial summary judgment on certain issues related all trusts, (Docket Entry No. 366). That motion will be addressed by separate opinion.

for declaratory judgment, relating to Riley's proposed role as a confidential IRS informant.  The defendants' motion for summary judgment on the plaintiffs' RICO claims, (Docket Entry No. 363), is granted.  The reasons for these rulings are explained in detail below.

## I.      Background

Mark Riley is a lawyer and an accountant who worked for Robert Alpert and entities that Alpert owned or controlled from June 1994 to October 1998.  Dixie Meynier is Riley's former legal assistant.  The plaintiffs are Robert Alpert and his sons, Roman Alpert and Daniel Alpert.  The entities at issue are the Roman Alpert Trust (RAT); the Daniel Alpert Trust (DAT); the Robert Alpert 1996 Children's Trust (the "Children's Trust") (together, the "three Trusts"); and the Alpert Family Charitable Remainder Unitrust (the "CRUT").

Alpert hired Riley in July 1994 to assist with financial and legal issues relating to various entities and companies owned by Alpert and managed through his management entity, Danro Corporation.  Alpert hired Riley to be general counsel and executive vice president of Danro Corporation and also as chief administrative officer of another Alpert entity, Alpert Companies.  The plaintiffs allege that Riley also had "treasury function of Alpert's companies and entities" and could freely transfer money among the various companies and entities.

In 1996, Riley recommended that Alpert form the CRUT as a tax-planning tool.  The CRUT was comprised of two separate partnerships, Markus Ventures, LP, formed by Riley on July 26, 1996, and James Ventures, LP, formed by Riley on March 19, 1997.  The plaintiffs allege that Riley "was actively engaged in the formation of the CRUT, the contribution of assets to the CRUT, and . . . the management of the CRUT and its related entities."  (*Id.*, ¶ 23).  On July 27, 1996, Alpert appointed Riley trustee of the CRUT.  The plaintiffs allege that Riley exercised "exclusive control"

2

over the CRUT until Riley was terminated as trustee in January 1999.  (*Id.*, ¶ 24).  The plaintiffs

claim that Riley appointed himself as trustee, which was improper because the Internal Revenue

Code prohibits a trustee from being a "related or subordinate party" to the grantor.  26 U.S.C. §

672(c).

In June 1998, Riley hired Lolley & Fontenot, P.C., an accounting firm, to assist Riley with

tax issues related to the CRUT.  The plaintiffs allege that Riley and Lolley & Fontenot had a

previous relationship and they later conspired to commit fraud.  The plaintiffs also allege that Riley

turned over tax returns and "relevant financial information" to Lolley & Fontenot, including for time

periods before Riley's employment.  (*Id.*, ¶ 27, 30).

In August 1998, two months after Riley hired Lolley & Fontenot, the plaintiffs allege that

Alpert began to realize that Riley had mismanaged the CRUT.  The plaintiffs allege that Riley

admitted to failing to file tax returns for the CRUT because of concerns that certain transactions

would invalidate it.  (*Id.*, ¶ 28).  The plaintiffs claim that Alpert was unaware of any issues relating

to the CRUT before the August 1998 meeting.  Alpert acknowledged that he "no longer trusted

Riley" by July 1998, when he hired Kevin Kennedy as chief financial officer and removed Riley

from his treasury functions.  (*Id.*, ¶ 29).

The relationship between Alpert and Riley continued to deteriorate.  The plaintiffs alleges

that in the "late summer of 1998," Riley left a threatening voice mail for Alpert.  The message stated

that Lolley & Fontenot were hiding "millions of dollars in Alpert's income from the IRS and that

. . . Alpert needed to do as Riley directed."  (*Id.*, ¶ 32).  In September 1998, Alpert terminated

Riley's employment.  The plaintiffs claim that because "of the large number of transactions with

which only Riley was familiar," there was a "transition phase" after Riley's termination.  (*Id.*, ¶ 33).

The plaintiffs have not elaborated on the length of this transition phase but the evidence shows that during the phase, Riley continued to have some involvement with the Alpert entities and with the CRUT.

Alpert hired Milbank, Tweed, Hadley & McCloy to resolve the tax issues related to the CRUT. Milbank Tweed audited the CRUT entities, made corrections to transactions, wrote an opinion letter, and filed appropriate tax returns. (*Id.*, ¶ 50). Alpert paid Milbank Tweed $279,027.00 for its legal services. Milbank Tweed also recommended that Alpert remove Riley as trustee of the CRUT, which Alpert did on January 27, 1999. Riley responded to his removal by filing a lawsuit in the state probate court against Alpert on April 1, 1999, arguing that Alpert had mismanaged the CRUT. Because the CRUT had charitable beneficiaries, the Texas Attorney General intervened and investigated Riley's accusation. The probate court appointed a bankruptcy attorney, Ron Sommers, as an auditor. Milbank Tweed represented Alpert in that suit, which remains pending in Probate Court No. 2 under Cause No. 305,353. The plaintiffs allege that Alpert paid over $100,000.00 in fees and expenses related to the CRUT case in the probate court. (*Id.*, ¶ 53).

In October 1998, Riley moved from Alpert's offices to new offices owned by Robert Hux. Hux and Riley also had a falling out that ended in litigation. Hux locked Riley out of the office in September 2001. (*Id.*, ¶ 38). During the litigation between them, Hux discovered a "large amount of sensitive data relating to Alpert" that Riley had left on Hux's computer system. (*Id.*, ¶ 39). Hux and Riley later reached a settlement agreement, but on October 13, 2003, Alpert, after learning of the documents, served a subpoena on the law firm that had represented Hux and still held the

documents he had found.  Hux's counsel complied with the subpoena and allowed the probate court to inspect them *in camera*.

Based on the documents found on Hux's computer, the plaintiffs alleged that in 1999, Riley, through his lawyers, Robert Scardino and Scot Courtney, "voluntarily approached the IRS and negotiated with the IRS to become an anonymous paid informant."  (*Id.*, ¶ 66).  According to the plaintiffs, Riley's plan was to profit at both ends, charging Alpert for legal and accounting services and then supplying the IRS with details of transactions that he, as Alpert's lawyer and accountant, had structured, mischaracterizing those transactions as tax fraud and reaping an informant's reward. (*Id.*, ¶¶ 68–70).  The plaintiffs attached a copy of an unsigned draft "Confidential Informant Award Agreement" ("CIRA") recovered from Hux's computer.  (*Id.*, Ex. 4).  The draft CIRA stated that "[t]his Informant has voluntarily upon his/her own initiative approached the IRS, through legal counsel offering to disclose the information in his/her possession" about "Taxpayer A and Taxpayer B" for the tax years 1992 through 1998.  The CIRA provided for a reward of "15 percent (15%) of the net taxes, fines and penalties (but not interest) collected," not to exceed $7,500,000.  (*Id.*).  Hux stated in an affidavit that Riley showed him drafts of the CIRA and analyses of Alpert's brokerage statements and other financial documents that Riley intended to provide to the IRS.  (*Id.*, Ex. 1). According to the plaintiffs, the files on Hux's computer revealed that Riley gave the IRS a "laundry list" of allegations that Alpert had committed tax fraud in his business entities and ventures and in the three Trusts and CRUT.  The files also showed that Riley had "tendered an enormous amount of documents concerning Alpert to the IRS."  (*Id.* at 20, 27 and Ex. 10).  The IRS, according to the plaintiffs, "took no actions against Alpert as a result of Riley's efforts other than to request certain reviews, and all of Alpert's returns were accepted, as filed, after those reviews."  (*Id.* at 37).

In this suit, filed September 28, 2004, the plaintiffs sued Riley for negligence; gross negligence; negligent misrepresentation; conversion; fraud; breach of fiduciary duty; aiding and abetting a breach of fiduciary duty; civil conspiracy in violation of RICO, 18 U.S.C. § 1861, *et seq.*; and violations of §§ 6103 and 7431 of Internal revenue code.  (Docket Entry No. 1).  The plaintiffs also sought a declaratory judgment that Riley cannot serve as trustee of the CRUT.  (*Id.*).  The plaintiffs allege that Riley "has a history of enriching himself at the expense of his former employers and clients" by "establishing attorney–client relationships with people who then rely on his advice," and that he followed this approach in his dealings with Alpert, the trusts, and the trust beneficiaries. (Docket Entry No. 132, Third Amended Complaint, ¶ 1).  This suit is based on Riley's actions relating to the DAT, the RAT, the Children's Trust, and the CRUT; actions relating to Alpert's other businesses and finances;  and Riley's actions in providing information against Alpert as a confidential informant for the IRS.  The claims related to the RAT, DAT, and Children's Trust are limited to actions taken by Riley after June 8, 2005.  The parties are litigating claims related to the defendants' acts before June 8, 2005 in Probate Court Number Two of Harris, County Texas, in the case styled *In re: Roman Alpert Trust, Daniel James Alpert Trust, and the Robert Alpert 1996 Children's Trust; Mark Riley, Trustee vs. Robert Alpert, et al.*  The probate court entered a final judgment on June 8, 2005.  Alpert appealed and the First Court of Appeals remanded the case to the probate court for further proceedings.  *Alpert v. Riley*, 274 S.W.3d 277 (Tex. App. — Houston [1st Dist.] 2008, pet. dism'd).  This court has dismissed the plaintiffs' claims relating to "the handling of the three Trusts that were the subject of the probate court litigation and judgment, through June 8, 2005."  *Alpert v. Riley*, H-04-3774, 2007 WL 963982, at *2 (S.D. Tex. Mar. 29, 2007).

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d

at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.    Limitations

The Texas Supreme Court "has consistently held that a cause of action accrues when a party has been injured by actions or omissions of another."  *Barker v. Eckman*, 213 S.W.3d 306, 311 (Tex. 2006) (citing *Moreno v. Sterling Drug., Inc.*, 787 S.W.2d 348, 351 (Tex. 1990).  "Accrual of a cause of action is deferred in two types of cases. In one type, those involving allegations of fraud or fraudulent concealment, accrual is deferred because a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run.  The other type, in which the discovery rule applies, comprises those cases in which the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable."  *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996) (internal quotations omitted).

The defendants seek judgment that limitations bars the plaintiffs' causes of actions "relating to Alpert's finances and businesses . . . including claims for RICO violations, negligence, gross negligence, negligent misrepresentation, conversion, fraud, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, conspiracy, and declaratory judgment that Riley is prohibited from serving as trustee of the CRUT."  (Docket Entry No. 361, at 1).  The plaintiffs respond that Riley committed a "continuing tort" by "guiding Alpert to execute transactions which Riley would later assert to the IRS were improper in the context of attempting to be paid as an informant." (Docket Entry No. 415, at 6).  Neither side describes which factual allegations relate to which causes of action.  Instead, the parties' briefing focuses on when the statute of limitations commenced, grouping all the causes of action together.  The defendants contend that the statute of limitations for

8

all claims began to run in August 1998 when Alpert acknowledged that he was suspicious of Riley's work related to the CRUT, or at the latest in January 1999, after Alpert received Milbank Tweed's advice related to the CRUT's tax issues. The plaintiffs contend that the statute of limitations did not begin to run until Alpert learned the full extent of Riley's alleged scheme in "the late quarter of 2003," when he reviewed the documents found on Hux's computer describing Riley's work with the IRS.

The plaintiffs' complaint alleges that Riley committed the torts of conversion, negligence, gross negligence, and negligent misrepresentation by improperly handling the CRUT and by the later communications informing the IRS of tax problems related to the CRUT caused by Riley's initial torts. The statute of limitations for the conversion, negligence, gross negligence, and negligent misrepresentation is two years. TEX. CIV. PRAC. & REM. CODE § 16.003(a). At the very latest, the statute of limitations for the claims arising from Riley's mishandling of the CRUT began to run in January 1999, when Milbank Tweed's report put Alpert on notice that Riley had mishandled the CRUT. Though Alpert may not have learned the full extent of Riley's alleged scheme in January 1999, he had, at the very least, learned by then that Riley had mishandled tax and other issues related to the CRUT. But the plaintiffs did not file suit until 2004, well after the two-year statute of limitations had expired. (Docket Entry No. 1).

The plaintiffs argues that under a "continuing violation" theory, the statute of limitations for the initial torts relating to the CRUT did not begin to run in January 1999 because Riley committed additional torts when he acted as an informant to the IRS. But the "continuing violation" doctrine does not apply "to actions that are 'complete in themselves.'" *See Roehrs v. Conesys, Inc.*, Civ. A. No. 3:05-CV-829-M, 2005 U.S. Dist. LEXIS 33295, at *9 (N.D. Tex. Dec. 14, 2005) (citing

*Twyman v. Whyman*, 790 S.W.2d 819, 819–20 (Tex. App.—Austin 1990), *rev'd on other grounds*, 855 S.W.2d 619 (Tex. 1993)).  These initial torts relating to Riley's handling of the CRUT were complete in themselves by January 1999.  The continuing violation doctrine is inapplicable.

The plaintiffs also argue that the discovery rule extends the statute of limitations.  But Alpert did not need to know the full extent of the alleged scheme to assert his claims for conversion, negligence, gross negligence, and negligent misrepresentation.  *See KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 749 (Tex. 1999) (overruling the appellate court's holding that "a claim does not accrue until plaintiff knows not only of the injury, but the specific nature of each wrongful act that may have caused the injury" because "accrual occurs when the plaintiff knew or should have known of the wrongfully caused injury"); *Johnson v. Baylor Univ.*, 188 S.W.3d 296 (Tex. App. — Waco 2006, pet. ref'd) (noting that for the statute of limitations to run "[t]he plaintiff need know the specific nature of each wrongful act that may have caused the injury").  Riley's motion for summary judgment on limitations as to the plaintiffs' conversion, negligence, gross negligence, and negligent misrepresentation claims is granted.

A four-year statute of limitations applies to the fraud and breach of fiduciary duty claims.  TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4), (5).  "Generally, in a case of fraud the statute of limitations does not commence to run until the fraud is discovered or until it might have been discovered by the exercise of reasonable diligence."  *Little v. Smith*, 943 S.W.2d 414, 420 (Tex. 1997).  Riley argues that Alpert discovered, or should have discovered, the fraud and alleged breaches of fiduciary duties either in August 1998, when Alpert acknowledged that he was suspicious of Riley; in January 1999, when Milbank Tweed provided advice on the CRUT and revealed to Alpert deficiencies in Riley's work; or on February 16, 2000, when Alpert and Riley

were involved in litigation together.  None of these events, however, put Alpert on notice as to Riley's alleged scheme to defraud Alpert by acting as a paid informant for the IRS.  The plaintiffs have produced evidence that Alpert was unaware of this scheme until 2003, when he received the documents from Hux's computer.  Riley's motion for partial summary judgment as to the fraud and breach of fiduciary duties claims is denied.[2]

## IV.    RICO

Riley argues that as a matter of law, the record shows that Riley's conduct did not constitute a "pattern" of activity under RICO.  Riley also argues that the record shows that Alpert did not rely on any of the alleged fraudulent mail or wire transfers.  The plaintiffs respond by arguing that the record shows a large number of money transfers made without authority by Riley to various entities he created and to various individuals associated with his fraudulent scheme.  The plaintiffs argue that all of these transfers were in furtherance of Riley's scheme to defraud Alpert, the trusts, and the trust beneficiaries.

RICO creates a cause of action for a person "injured in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c); *St Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 439 (5th Cir. 2000).  A claim under 18 U.S.C. § 1962(c) entails "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise."  *In re MasterCard Intern. Inc.*, 313 F.3d 257, 260 (5th Cir. 2002).  The record shows that, as a matter of law, there is no pattern that could satisfy RICO.

---

[2]    Riley also moved for summary judgment on limitations as to the plaintiffs' request for a declaratory judgment that Riley is prohibited from serving as trustee of the CRUT, but Riley has not raised any argument as to why the statute of limitations bars this claim.  This portion of the motion is denied.

"A pattern of racketeering requires two or more predicate acts and a demonstration that the racketeering predicates are related and amount to or pose a threat of continued criminal activity. The predicate acts can either state or federal crimes." *Id.* at 261–62.  Courts however are "cautious about basing a RICO claim on predicate acts of mail and wire fraud because 'it will be the unusual fraud that does not enlist the mails and wires in its service at least twice.'" *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.2d 225, 238 (4th Cir. 2000) (quoting *Anderson v. Foundation for Advancement, Educ., and Employment of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998)).

The Supreme Court has held that to demonstrate a pattern of activity for a RICO claim, a plaintiff must establish "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989).  "A plaintiff may satisfy this requirement by demonstrating either close-ended or open-ended continuity.  Close-ended continuity exists when a series of related predicates extends over a substantial, closed period of time.  By contrast, open-ended continuity exists when there is threat that the occurrence or predicate acts will 'extend indefinitely into the future.'" *Lefkowitz v. Bank of New York*, No. 01 Civ. 6252 VM, 2003 WL 22480049, at *8 (S.D.N.Y. Oct. 31, 2003), *overruled on other grounds by* 528 F.3d 102 (2d Cir. 2007) (quoting *H.J. Inc.*, 429 U.S. at 242).

"Courts have uniformly and consistently held that schemes involving a single, narrow purpose and one or few participants directed towards a single victim do not satisfy the RICO requirement of closed or open pattern continuity." *Lefkowitz*, 2003 WL 22480049, at *8; *see also Western Assocs. v. Market Square Assocs.*, 235 F.3d 629, 636–37 (D.C. Cir. 2001) (upholding district court's dismissal of RICO action based on a partnership dispute because the alleged predicate acts all contributed to a single harm of diminishing the limited partner's interest and

12

targeted only the limited partner and thus were not a "pattern" under RICO); *Effron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 21 (1st Cir. 2000) (upholding district court's dismissal of RICO action based on a partnership dispute because "[t]aken together, the acts as alleged comprise a single effort, over a finite period of time, to wrest control of a particular partnership from a limited number of its partners"); *Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F. Supp. 579, 584–85 (S.D.N.Y. 1989) (finding that fifty acts of mail fraud in furtherance of a simple, single-victim scheme insufficient to constitute a pattern); *Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 257 (S.D.N.Y. 2002) (holding that a scheme of four predicate acts of mail fraud committed by one participant against a limited number of victims in furtherance of a single fraudulent scheme aimed at stealing the assets of a foundation and its principle was too discrete and limited to satisfy closed-end continuity).

The record also shows that other elements of a RICO claim are not met. "'The 'by reason of' language of RICO has been interpreted by the Supreme Court, *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), and by [the Fifth Circuit], *Summit*, 214 F.3d at 558, to require a showing that the fraud was the 'but for' cause and 'proximate' cause of the injury." *Sandwich Chef of Tex., Inc. v. Reliance Nate. Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003). Under RICO, when civil damages are sought for injuries resulting from fraud, the plaintiff must show reliance on the fraud. *See id.* at 219 ("RICO fraud cases require a showing of detrimental reliance *by the plaintiff*, which is consistent with *Holmes*'s admonition that federal courts employ traditional notions of proximate cause when assessing the nexus between a plaintiff's injuries and the underlying RICO violation." (emphasis in original)); *Summit Properties Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556, 559 (5th Cir. 2000) (stating that in a criminal RICO case "the government can

13

punish unsuccessful schemes to defraud because the underlying mail fraud violation does not require reliance, but a civil plaintiff 'faces an additional hurdle' and must show an injury caused 'by reason of' the violation).

The plaintiffs have not identified or produced evidence that they relied on any of the mail and wire transfers. This court has twice admonished the plaintiffs that, in addition to demonstrating that Riley used the mail and interstate wires, they must demonstrate that they detrimentally relied on Riley's use of the mail and interstate wires. *See Alpert v. Riley*, Civ. A. No. H-04-CV-3774, 2007 WL 963982, at *17 (S.D. Tex. Mar. 29, 2007) ("[T]he plaintiffs allege that the wire and mail fraud included 'electronic banking transactions and interstate phone calls to the Plaintiffs . . . . However, the plaintiffs do not plead that they relied on particular communications, causing injury."); *Alpert v. Riley*, Civ. A. No. H-04-CV-3774, 2008 WL 304742, at *13 (S.D. Tex. Jan. 31, 2008) (dismissing an amended complaint against attorney defendants because, though the complaint described additional interstate communications, it did not "explain how [the plaintiffs] relied on the alleged communications"). The plaintiffs list dozens of wire transfers Riley made from the trusts to Riley or to entities which Riley controlled. (Docket Entry No. 416, at 4–17). But the plaintiffs have neither produced nor identified evidence that he detrimentally relied on any of these transfers. That Alpert did not rely on these transfers is further evidenced by the fact that all of these alleged transfers occurred after Riley stopped working for Alpert.

The plaintiffs also allege as predicate acts that "Riley tricked Alpert into funding a tax payment the 96 Trust" and that "Riley established an account for the 96 Trust at Chase Securities of Texas, even though he was not the trustee." (Docket Entry No. 416, at 4). But the plaintiffs have neither identified nor produced evidence that Riley accomplished either through interstate

communications.  To the contrary, most of the communications are instructions by Riley to transfer monies out of the various trusts or to transfer monies amongst entities Riley created.  The plaintiffs have failed to show a fact issue as to reliance.

The plaintiffs have also failed to raise a fact issue as to a "pattern."  Under RICO, courts look to a variety of factors to determine whether the defendant's activities constituted a pattern, including, "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the activity."  *See Western Assocs.*, 235 F.3d at 633; *see also Vicom, Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771, 780 (7th Cir. 1994) (assessing continuity based on the number of victims, the presence of separate schemes, and the occurrence of distinct injuries); *Resolution Trust Co. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993) (considering, in addition to duration, the "extensiveness" of the RICO scheme, including the number of victims, variety of racketeering acts, whether the injuries caused were distinct, and the complexity and size of the scheme).  Though courts have acknowledged that an alleged scheme's duration carries weight in this analysis, courts have found that even if the alleged scheme occurs over a long period of time, it does not constitute a "pattern" of activity when the alleged scheme involves a small number of perpetrators, a small number of victims, and a single scheme.  *See Western Assocs.*, 235 F.3d at 264–65 (finding that an alleged scheme occurring over eight years did not constitute a pattern of activity because the alleged predicate acts all contributed to a single harm of diminishing a limited partner's interest).

The plaintiffs have alleged a scheme that began in 1997, but almost every act of the alleged scheme was perpetrated by Riley and attorneys Riley hired at different points.  The alleged scheme targeted Alpert, Alpert's businesses, and trusts Alpert created for his children.  Though the victims

of the alleged scheme could be characterized as "different," courts have found that schemes are limited when the entities are closely related.  *See Lefkowitz*, 2003 WL 22480049, at *8–9 (rejecting plaintiff's argument that the scheme's victims were "at least twenty entities, including two estates and three companies in the United States, two estates and three companies in Hong Kong, and nine trusts" because the entities were all related to the plaintiff and the estates of her parents).  The scheme also had a narrow purpose.  The plaintiffs assert that the scheme had a narrow purpose, to "funnel[] the Alpert Trusts' funds to himself and his business associates."  (Docket Entry No. 416, at 19).  The record demonstrates that the scheme involved limited number of perpetrators and victims, and had a narrow focus and goal.  This does not constitute a pattern under RICO.

## V.    Conclusion

The defendants' motion for summary judgment on limitations, (Docket Entries No. 361, 362),  is granted in part and denied in part.  The motion is granted as to the plaintiffs' claims for conversion, negligence, gross negligence, and negligent misrepresentation, and denied as to the plaintiffs' claims for fraud, breach of fiduciary duties, aiding and abetting a breach of fiduciary duties, and the plaintiffs' request for declaratory judgment.  The defendants' motion for summary judgment on the plaintiffs' RICO claims, (Docket Entry No. 363), is granted.

SIGNED on February 8, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge